PENSKE TRUCK LEASING COMPANY, L.P., Plaintiff-Appellee, v. CHEMETCO, INC., Defendant-Appellant and Third-Party Plaintiff (United Freight Express, Inc., Third-Party Defendant).

Fifth District   No. 5—98—0771

Opinion filed January 19, 2000.

Patrick M. Flynn, of Flynn & Guymon, of Belleville, for appellant.

William P. Gavin, of Gavin Law Firm, of Belleville, for appellee.

PRESIDING JUSTICE GOLDENHERSH delivered the opinion of the court:

Defendant and third-party plaintiff, Chemetco, Inc., appeals from a judgment of the circuit court of Madison County in favor of plaintiff, Penske Truck Leasing, Co., L.P., in the amount of $200,478.15, consisting of $53,514.76 for a lease-payment delinquency, $88,216 for liquidated damages, $32,598.07 for interest, and $26,149.32 for attorney fees. Third-party defendant, United Freight Express (UFE), was out of business at the time of trial and did not participate. Likewise, it takes no part in this appeal. The issues we are asked to address are (1) whether the liquidated-damages clause of the contract is an unenforceable penalty provision and (2) whether the trial court erred in computing the damages owed to plaintiff. We affirm in part, reverse in part, and remand with directions.

## BACKGROUND

The instant case involves a default on a vehicle lease service agreement (agreement). On May 3, 1995, plaintiff and UFE entered into the agreement for a term of 36 months, covering four trucks identified as units 141580, 141581, 141582, and 141583. Additional vehicles could be added pursuant to paragraph three of the lease agreement. Defendant's role was to guarantee performance and payment of the

lease by UFE. Plaintiff would not agree to lease the vehicles to UFE without defendant's guarantee.

The lease began on July 1, 1995. In 1996, UFE defaulted on the lease by failing to make lease payments as agreed upon by the parties. Plaintiff sent defendant and UFE a default notice on September 13, 1996. In this notice, plaintiff terminated the lease agreement, demanded immediate payment of $56,132.76, which was the amount then due, and demanded that UFE purchase the trucks within five days. Plaintiff calculated the purchase price of all four vehicles as follows:

| | |
|---|---|
| "Schedule A Value per vehicle | $45,241.00 |
| Less Depreciation | <6,120.40> |
| **Purchase Price Due Penske per vehicle** | **39,120.60** |
| **Total Purchase Price, all vehicles** | **$156,482.40.**" (Bold in original.) |

Plaintiff declared $212,615.16 as the total amount due as of September 13, 1996, and announced that unless such sum was paid within five days, it would "pursue remedies available *** under the terms and conditions of the Agreement."

The contract provisions in issue read as follows:

"15. DEFAULT AND REMEDIES. (A) If (i) CUSTOMER shall fail or refuse to pay any charges under this lease when due, or (ii) CUSTOMER shall fail or refuse to perform any other term of this lease for five (5) days after written notice thereof is sent to CUSTOMER by PENSKE TRUCK LEASING, or (iii) CUSTOMER or any guarantor of CUSTOMER's obligations shall become insolvent or make a bulk transfer of its assets to make an assignment for the benefit of creditors, or (iv) CUSTOMER or any guarantor of CUSTOMER's obligations shall file or suffer the filing against it of a petition under the Bankruptcy Code or under any other insolvency law or law providing for the relief of debtors, or (v) if any representation or warranty made by CUSTOMER herein or in any document furnished by CUSTOMER or guarantor of CUSTOMER's obligations shall prove to be incorrect in any material respect, then in any of such events PENSKE TRUCK LEASING shall be entitled to pursue the remedies specified in the following paragraph.

Upon the happening of one of the preceding Events of Default, PENSKE TRUCK LEASING may, with or without terminating this lease, with or without demand or notice to CUSTOMER, and with or without any court order or process of law, take immediate pos-

session of, and remove, any and all Vehicles covered by this lease wherever located, and/or retain and refuse to deliver, and/or re[ ]deliver to CUSTOMER, the Vehicle(s), without PENSKE TRUCK LEASING being liable to CUSTOMER for damages caused by such taking of possession. Whether or not it shall have exercised its right to take possession of the Vehicles upon the happening of any Event of Default, PENSKE TRUCK LEASING may, with or without terminating this lease as to one (1) or more Vehicles, require CUSTOMER[,] upon five (5) days' written notice to CUSTOMER, to, at PENSKE TRUCK LEASING's option, either purchase the Vehicle(s) or make the alternative payment in accordance with Article 16[ ] and[,] in addition, pay to PENSKE TRUCK LEASING the total of the lease charges and any guaranteed mileage charges for all such Vehicles up to the date upon which CUSTOMER could have terminated this lease by exercise of its rights under Article 16, together with the sum of all charges due and unpaid to the date of PENSKE TRUCK LEASING's notice to CUSTOMER under this paragraph.

In the event that CUSTOMER shall fail to purchase the Vehicle (or, at PENSKE TRUCK LEASING's option, make the alternative payment)[ ] and pay all other sums provided in the preceding paragraph, PENSKE TRUCK LEASING may sell the Vehicle(s) at one (1) or more public or private sales, with or without notice to CUSTOMER, and with or without having the Vehicle(s) at the sale. The proceeds of the sale, less PENSKE TRUCK LEASING's expenses of retaking, storage, repair, and resale, shall be applied to payment of any obligations due to PENSKE TRUCK LEASING by CUSTOMER under this Lease or otherwise. CUSTOMER shall remain liable for the balance due PENSKE TRUCK LEASING under the preceding paragraph and for any deficiency in the balance of any sums due PENSKE TRUCK LEASING under any other lease or indebtedness. If PENSKE TRUCK LEASING is unable to sell the Vehicle upon terms and within a period of time satisfactory to it *** or if it shall elect not to sell the vehicle, then PENSKE TRUCK LEASING may retain the Vehicle, crediting CUSTOMER with the then Net Fair Market Value of the Vehicle (defined as the highest appraisal of Fair Market Value (wholesale) received by PENSKE TRUCK LEASING from two (2) or more independent vehicle dealers, less all expenses and costs incurred by it). The Net Fair Market Value of the Vehicle shall be applied to CUSTOMER's obligations to PENSKE TRUCK LEASING[,] and CUSTOMER shall remain liable for any sums due to PENSKE TRUCK LEASING under this lease or otherwise. All amounts to be retained by PENSKE TRUCK LEASING and any balance to be paid by CUSTOMER under this lease shall not be construed as a penalty,

but as liquidated damages for the breach of this lease, and as PENSKE TRUCK LEASING's reasonable return for the use of the Vehicles and for their depreciation.

In addition, PENSKE TRUCK LEASING may proceed by appropriate court action to enforce the terms of this lease or to recover damages for the breach of any of its terms.

In the event PENSKE TRUCK LEASING takes possession of or retains any Vehicle and there shall, at the time of taking or retention, be in, upon[,] or attached to the Vehicle any property or things of a value belonging to CUSTOMER or in CUSTOMER's custody or control, PENSKE TRUCK LEASING is authorized to take possession of such items and either hold the items for CUSTOMER or place them in public storage for CUSTOMER, at CUSTOMER's sole cost and risk of loss or damage.

(B) In the event PENSKE TRUCK LEASING shall fail or refuse to perform or observe any material term of this lease for thirty (30) days after written notice is sent to PENSKE TRUCK LEASING by CUSTOMER, CUSTOMER shall be entitled, as its sole remedy, to either (i) terminate this lease as to the Vehicle(s) which is (are) the subject of default ('Defaulting Vehicle(s)') and purchase such Defaulting Vehicle(s) for cash in accordance with Article 16 and make the other payments required to be made thereunder[ ] or (ii) in good faith and without unreasonable delay obtain a vehicle (substantially similar in the equivalent carrying capacity and design to the Defaulting Vehicle(s)) in substitution for the Defaulting Vehicle(s) and, subject to Article 20, recover damages from PENSKE TRUCK LEASING as to such Defaulting Vehicle(s).

16. TERMINATING PRIVILEGES. Either party may[,] upon sixty (60) days' prior written notice to the other, terminate this lease as to one (1) or more of the Vehicles on the annual anniversary of their respective in[-]service dates.

Upon termination by either party, CUSTOMER shall, at PENSKE TRUCK LEASING's option, purchase the Vehicle as to which the notice has been given[,] other than substitute, interim, or additional vehicle(s). Alternatively, in lieu of purchasing the Vehicle, CUSTOMER may elect to pay PENSKE TRUCK LEASING the difference, if any, between the purchase price as calculated in this Article and the Fair Market Value (defined as the highest appraisal of market value (wholesale) received by PENSKE TRUCK LEASING from two (2) or more independent vehicle dealers) of each such vehicle as of the date of termination (the 'alternative payment').

The purchase price of the Vehicle shall be the original agreed value of the Vehicle set forth in Schedule 'A' less the monthly depreciation credit of the Vehicle set forth in Schedule 'A'

multiplied by the number of months elapsed from the in[-]service date of the Vehicle to the termination date, provided, however, that the purchase price to be paid by the CUSTOMER for the Vehicle shall not be less than fifteen percent (15%) of its original agreed value set forth in Schedule 'A'.

CUSTOMER shall simultaneously pay all outstanding lease charges through and including the date of purchase of the Vehicle (or date the alternative payment is made by CUSTOMER), together with applicable sales or use taxes and that portion of all license and registration fees, applicable personal property taxes, and prepaid expenses paid by PENSKE TRUCK LEASING with respect to the Vehicle, pro[ ]rated to the date of termination. Upon receipt thereof, PENSKE TRUCK LEASING shall cause the conveyance to CUSTOMER of title to the Vehicle to be purchased, as-is, where-is. CUSTOMER shall have no right to exercise any option to terminate, or to effect the termination of, this lease under this Article while CUSTOMER shall be in default under this lease. No cancellation or other termination of this lease by either party shall in any way release CUSTOMER of liability for the payment of any sum(s) due or to become due PENSKE TRUCK LEASING under this lease or any damages which it shall have sustained by reason of CUSTOMER's breach thereof."

Neither UFE nor defendant acceded to plaintiff's demand to pay $212,615.16. Instead, UFE returned the four leased trucks to plaintiff on August 28, 1996. On January 8, 1997, plaintiff filed suit against defendant, seeking $150,375.72, plus its collection and litigation expenses, accrued interest, and costs of suit. Defendant raised affirmative defenses, including, *inter alia*, that the premature-termination liquidated-damages formula provided for in the lease is actually an unenforceable penalty provision.

A bench trial was conducted on August 26, 1998. Plaintiff called David Hoff as a witness. Hoff was defendant's president and signed the lease on behalf of defendant. Hoff was employed elsewhere at the time of trial. Hoff has an undergraduate degree in industrial supervision and a master's degree in business administration (MBA). Hoff admitted that plaintiff did not take advantage of him in getting him to sign the lease of behalf of defendant.

The only other witness called was Robert Douglas, director of maintenance systems in plaintiff's corporate offices. In 1995, he was a district manager for plaintiff. His territory included southern Illinois. He stated that the trucks in question came out of plaintiff's rental fleet and were not special-ordered. He explained that plaintiff spends an extensive amount of time planning its needs and purchasing vehicles for its rental fleet. Plaintiff buys only the trucks it will need for the year and does not flood the market.

Douglas testified that after UFE returned the four trucks, plaintiff investigated the market to determine the trucks' value and discovered that the market was depressed. According to Douglas, plaintiff would have made a bad business decision if it had sold the trucks at this point because the trucks' market value was only about one half of what it should have been. Plaintiff also checked the possibility of leasing or renting the trucks to another company or individual to get some revenue to offset some of the expenses. Ultimately, plaintiff obtained bids for fair market value of the trucks from two independent wholesalers and calculated liquidated damages as per the agreement.

On cross-examination Douglas admitted that plaintiff had a duty to mitigate damages under the contract. In an attempt to do this, plaintiff rented the four trucks to other businesses after UFE returned the trucks to plaintiff. Plaintiff's records indicate that the trucks were leased again from September 26, 1996, through June 9, 1997, for a total of $32,808.45. Plaintiff's records also indicate that on March 10, 1997, the four trucks were sold to Freightliner for $30,400 each. Neither the additional $32,808.45 in lease money nor the $30,400-per-truck sale price was considered by the trial court in computing damages.

The trial court computed plaintiff's award in the following manner: The agreement set the original truck values at $45,241 each. The amount of $6,120.40 was then deducted, representing the agreed-upon monthly depreciation amount of $470.80 multiplied by 13, the number of months that elapsed between the commencement of the lease and the premature termination, for a total of $39,120.60 per truck. The appraised value of each truck was deducted. The trial court calculated the wholesale value of each truck at $17,066.60, resulting in a net fair market value of $22,054 per truck. Liquidated damages were calculated at $88,216, which is the net fair market value multiplied by four. The trial court added that amount to the amount of the past-due invoice of $53,514.76. It multiplied that amount by 1% for 23 months to determine the interest due, $32,598.07, for a total of $174,328.83. Fifteen percent of that amount, $26,149.32, was added for attorney fees, for a total award of $200,478.15. The trial court entered judgment in that amount. Defendant filed a timely notice of appeal.

## ANALYSIS

### I. Liquidated Damages or Penalty Provision?

The first issue we are asked to consider is whether the liquidated-damages clause of the contract is actually an unenforceable penalty provision. Defendant asserts that liquidated-damages provisions are

valid and enforceable only if the stipulated amount is a reasonable estimate of actual damages and actual damages would be impossible or difficult to determine. Defendant contends that the evidence here demonstrates that in case of a breach there would be ample information to determine actual damages using the agreed-upon value of the original lease agreement, the lease depreciation credit, the company's re-lease records, and the sale-proceeds records or, in the event the vehicles are not sold, the independent wholesale appraisals. Moreover, defendant contends that the stated reasons given by Mr. Douglas as reasons for the lease do not establish an intention by the parties to agree in advance to the settlement of damages that would arise upon a breach of the agreement. Finally, defendant asserts that the language of the agreement that allows for alternative remedies makes the provision in question a penalty *per se*. Plaintiff responds that the provision at issue is an enforceable liquidated-damages provision because it provides for an amount of damages that is reasonable in light of the anticipated harm. The lease provides for a formula, as opposed to a specific amount, which begins with an agreed-upon original amount and takes into consideration the amount of depreciation of the trucks before they are returned and the used truck market at the time of the breach. We agree with the trial court and with plaintiff that the agreement provided for liquidated damages rather than a penalty.

■ Whether a contractual provision for damages is a valid liquidated-damages provision or a penalty clause is a question of law. See *Hickox v. Bell*, 195 Ill. App. 3d 976, 552 N.E.2d 1133 (1990). There is no fixed rule applicable to all liquidated-damages agreements, and each one must be evaluated on its own facts and circumstances. See *Likens v. Inland Real Estate Corp.*, 183 Ill. App. 3d 461, 539 N.E.2d 182 (1989). The test for determining whether a liquidated-damages clause is valid as such or is void as a penalty is stated in section 356 of the Restatement (Second) of Contracts:

> "Damages for breach by either party may be liquidated in the agreement but only at an amount that is reasonable in the light of the anticipated or actual loss caused by the breach and the difficulties of proof of loss. A term fixing unreasonably large liquidated damages is unenforceable on grounds of public policy as a penalty."

Restatement (Second) of Contracts § 356 (1979). The difficulty of proof of loss is a matter to be determined at the time of contracting, not the time of breach. See Restatement (Second) of Contracts § 356, Comment *b* (1979).

■ In considering whether the liquidated-damages formula contained in paragraph 15 of the agreement was enforceable, we consider not only the language of the provision but also the testimony

of the witnesses at trial. As plaintiff indicated, the agreement does not set forth a sum certain in case of a breach by the customer, but it provides a formula for computing damages in case of a breach. Paragraph 15 of the agreement sets forth alternative methods of computing damages. The first method comes into play if plaintiff decides to sell the vehicles after default. The proceeds of the sale, less plaintiff's "expenses in retaking, storage, repair, and resale, shall be applied to payment of any obligations due to [plaintiff]." The customer, however, remains liable for the balance due under the lease. The second method comes into play if plaintiff decides not to sell the vehicles. This method requires plaintiff to credit the customer with the net fair market of the vehicles, described as "the highest appraisal of Fair Market Value (wholesale) received by [plaintiff] from two (2) or more independent vehicle dealers, less all expenses and costs incurred by it." Under this method defendant also remains liable to plaintiff for any sums due under the lease.

Paragraph 15 specifically states that the amounts retained by plaintiff and any balance due under the agreement "shall not be construed as a penalty, but as liquidated damages for the breach of this lease." While that language is not in itself controlling, it should be given some weight. See *United Order of American Bricklayers & Stone Masons Union No. 21 v. Thorleif Larsen & Son, Inc.*, 519 F.2d 331, 333 (7th Cir. 1975). The inclusion of the term *liquidated damages* indicates to us an arrangement by the parties that takes into consideration the possibility of breach and the necessity to take into account damages for such a breach. Defendant knew the risk it was undertaking by agreeing to guarantee the lease between plaintiff and UFE. Plaintiff refused to lease the vehicles to UFE without a guarantee.

At trial, plaintiff called defendant's president at the time the agreement was signed. He was not unsophisticated in business matters. He had a broad business background, including an MBA. He admitted that plaintiff did not take advantage of him in the process of getting him to sign the agreement. Defendant did not call any witnesses at trial and did not show that the liquidated-damages provision was unreasonable in light of the anticipated actual loss that would be caused by a breach or the difficulties of proof of loss. Defendant failed to rebut the testimony of Robert Douglas, who testified that the used truck market was cyclical. The record is replete with evidence that it was difficult to determine plaintiff's losses with regard to a breach of the agreement at the time the agreement was entered by the parties because the used truck market is difficult to predict in advance. Under these circumstances, the alternative formulas provided for in the

agreement appear reasonable. We conclude that the agreement provided for an enforceable liquidated-damages provision and not an unenforceable penalty provision.

## II. Computation of Damages

We move now to the second issue raised by defendant, whether the trial court erred in computing the damages owed to plaintiff. Defendant does not deny that it owes plaintiff some damages, but defendant contends that the trial court erred in computing the damages owed plaintiff because it based its computation of liquidated damages on the faulty assumption that plaintiff decided to retain the vehicles, contrary to plaintiff's pleadings and the evidence presented at trial. The evidence at trial showed that within six months of the vehicles' return to plaintiff, each of the vehicles was sold for $30,400, for a total of $121,600. Defendant contends it is entitled to have $30,400 per vehicle applied to its obligations to plaintiff rather than the wholesale value of $17,066.60 per vehicle applied by the trial court. Defendant also asserts that it is entitled to a credit for lease payments received by plaintiff prior to the sale of the trucks. Plaintiff responds that its actions with regard to the four trucks were consistent with its rights under the lease. Plaintiff chose not to sell the trucks immediately after defendant and UFE failed to respond to plaintiff's request to purchase the trucks at the depreciated value of $156,482.40, because the return at that time would have been low due to a depressed used-truck market. Likewise, plaintiff responds that the agreement does not give defendant the right to credit for the gross amount of rentals received by plaintiff after the return of the trucks. Plaintiff points out that it has the ability to lease an indeterminate amount of vehicles, limited only by customer demand. Therefore, had UFE not defaulted, plaintiff would have continued to receive not only lease income from UFE for the four trucks leased under the agreement in question, but also lease income from another party for additional trucks. Instead, the other party rented UFE's returned trucks. Both parties make convincing arguments.

■ Black's Law Dictionary defines liquidated damages as "[a]n amount contractually stipulated as a reasonable estimation of actual damages to be recovered by one party if the other party breaches." Black's Law Dictionary 395 (7th ed. 1999). The following general contract principles also guide us in our interpretation of the liquidated-damages provision.

> "The primary object of a court in construing a contract is to give effect to the intention of the parties. [Citation.] Generally, the intention of the parties is to be determined from the final agree-

ment executed by them rather than from preliminary negotiations and the construction placed upon the agreement by the parties [citations], but when there is an ambiguity arising from terms of a contract, meaning may be derived from extrinsic facts ***. [Citations.]" *Hickox v. Bell*, 195 Ill. App. 3d 976, 989-90, 552 N.E.2d 1133, 1142 (1990).

In interpreting provisions that affix the amount of damages in the event of a breach, courts "lean toward a construction which excludes the idea of liquidated damages and permits the parties to recover only the damages actually sustained." *Arco Bag Co. v. Facings, Inc.*, 18 Ill. App. 2d 110, 116, 151 N.E.2d 438, 441 (1958).

■ In the instant case, as previously discussed, paragraph 15 of the agreement provides alternative methods of computing damages. One method is applicable if plaintiff decides to sell the vehicles, while another method is used if plaintiff retains the vehicles. The trial court awarded damages based upon the method which assumed that plaintiff retained the vehicles. While Mr. Douglas testified that plaintiff initially decided to retain the vehicles because of a depressed market, the evidence is clear that plaintiff ultimately sold all four vehicles for $30,400 each. We are certain that it was never the intention of the parties to permit plaintiff to proceed under the method of recovery used when plaintiff decides to retain the vehicles but later sells the vehicles and reaps a windfall in the process. If we allowed plaintiff to proceed in this manner, the damages would be so unreasonable that we should refuse to enforce the provisions of paragraph 15, and that paragraph would have to be considered a penalty provision.

■ The award entered by the trial court was well in excess of the actual damages suffered by plaintiff as a result of UFE's and defendant's breach. The trial court erred in computing plaintiff's damages. It should have computed damages using the alternative method provided for in paragraph 15, in which the proceeds of the sale, here $30,400 per truck, are applied as payment toward defendant's obligations. However, we disagree with defendant's assertions that it should receive credit for the gross amount of rentals received by plaintiff on these four trucks after UFE returned them to plaintiff. A review of the contract shows that no such provision was included. After careful consideration, we agree with plaintiff's argument that had UFE not breached, plaintiff would have received rental income from both UFE and the party who later rented the returned vehicles, instead of only the party who rented UFE's returned vehicles.

## CONCLUSION

We agree with the trial court's determination that the agreement provided for an enforceable liquidated-damages clause and not an

unenforceable penalty provision. However, we disagree with the method used by the trial court in computing liquidated damages and reverse on this issue. We remand to the trial court with directions to credit defendant with the proceeds of the sale of the trucks. The new computation of liquidated damages will lower both the award of interest and attorney fees due plaintiff.

For the foregoing reasons, the judgment of the circuit court of Madison County is affirmed in part and reversed in part, and the cause is remanded with directions.

Affirmed in part and reversed in part; cause remanded with directions.

RARICK and KUEHN, JJ., concur.