# Illinois Official Reports

## Appellate Court

***GK Development, Inc. v. Iowa Malls Financing Corp.***, 2013 IL App (1st) 112802

| | |
|---|---|
| Appellate Court Caption | GK DEVELOPMENT, INC., an Illinois Corporation, and COLLEGE SQUARE MALL DEVELOPMENT, LLC, a Delaware Limited Liability Company, Plaintiffs-Appellees, v. IOWA MALLS FINANCING CORPORATION, a Delaware Corporation, COLLEGE SQUARE MALL ASSOCIATES, LLC, a Delaware Limited Liability Company, and CHICAGO TITLE AND TRUST COMPANY, an Illinois Corporation, Defendants-Appellants. |
| District & No. | First District, Fourth Division<br>Docket Nos. 1-11-2802, 1-12-0432 cons. |
| Filed | December 19, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action arising from plaintiffs' purchase of several shopping centers from defendants for $117 million, the appellate court reversed the trial court's order awarding plaintiffs $4.3 million placed in escrow pursuant to the parties' agreement that the money would go to plaintiffs if a current tenant did not complete its expansion into a recently vacated space by a certain deadline, but would go to defendants if the move was completed on time, since the agreement was an invalid and unenforceable penalty clause that did not satisfy the requirements of *Jameson*, the agreement gave plaintiff buyer a windfall, and it functioned as a penalty for nonperformance because the penalty was not related to any actual damages; furthermore, the appellate court remanded the cause with directions to allow the trial court to hear evidence as to whether plaintiffs suffered any actual damages as a result of the tenant's 91-day delay in completing its move and to award plaintiffs those damages out of the escrowed funds, with the balance going to defendants, and the trial court was also directed to determine whether there was any breach by plaintiffs that would entitle defendants to an award of court costs and attorney fees. |

| | |
|---|---|
| Decision Under Review | Appeal from the Circuit Court of Cook County, Nos. 06-CH-3427, 06-CH-3586 cons.; the Hon. Carolyn Quinn, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part with instructions. |
| Counsel on Appeal | Kent Maynard, Jr., and Heather Nicole Koffman, both of Kent Maynard & Associates LLC, of Chicago, for appellants. |
| | J. Timothy Eaton and Jonathan B. Amarilio, both of Shefsky & Froelich Ltd., of Chicago, for appellees. |
| Panel | PRESIDING JUSTICE HOWSE delivered the judgment of the court, with opinion. Justices Fitzgerald Smith and Lavin concurred in the judgment and opinion. |

## OPINION

¶ 1     The issue presented in this case is whether a provision in a contract for the sale of four shopping centers, which required that $4.3 million of the purchase price be held in escrow from the seller's proceeds then be paid to the seller only if certain conditions are timely met, is enforceable as a liquidated damages clause or is unenforceable as a penalty.

¶ 2     In a $117 million transaction, plaintiffs GK Development, Inc., and College Square Mall Development, LLC (collectively Buyer), purchased from defendants Iowa Malls Financing Corporation and College Square Mall Associates, LLC (collectively Seller), four shopping centers in eastern Iowa, including College Square Mall (Mall). Prior to the sale, Mall tenant Hy-Vee Food Stores, Inc. (Hy-Vee), was in the process of expanding its grocery store (Hy-Vee Expansion) into the space that had been vacated by Wal-Mart after Wal-Mart decided not to renew its lease. Because the parties did not expect the Hy-Vee Expansion to be completed by the time of the closing, Buyer and Seller negotiated to hold $4.3 million of the purchase price in escrow (Hy-Vee Holdback), which represented the present value of the leasehold with regard to the forthcoming Hy-Vee Expansion.

¶ 3     An amendment to the purchase agreement directed defendant Chicago Title and Trust Company (the Escrowee) to release the Hy-Vee Holdback to Seller only after and if all the following events occurred: (1) a new Hy-Vee lease was executed by August 31, 2005; (2) the

- 2 -

new Hy-Vee leasehold was delivered by Buyer and accepted by Hy-Vee before October 31, 2005; and (3) Hy-Vee obtained all permits and other governmental approvals necessary to complete the Hy-Vee Expansion prior to October 31, 2005. Hy-Vee did not obtain the necessary permits before October 31, 2005; however, both parties demanded that the Escrowee disperse the Hy-Vee Holdback in their favor. Both Buyer and Seller subsequently filed separate lawsuits seeking a declaratory judgment regarding their entitlement to the Hy-Vee Holdback, and the two lawsuits were consolidated into the instant action. Following a three-week bench trial, the trial court found that the parties intended a "drop-dead deadline" of October 31, 2005 for plan and permit approval, and that Buyer was entitled to the Hy-Vee Holdback as liquidated damages for a breach of contract. The trial court also granted Seller's posttrial motion to "Stay Enforcement of the Circuit Court's order and Judgment and Not Apply Post-Judgment Interest During Appeal." Both parties appealed, and those appeals were consolidated.

¶ 4        Within Seller's appeal (appeal No. 1-11-2802), Seller argues: (1) that the Hy-Vee Holdback is not a valid liquidated damages provision because it amounts to an unenforceable penalty clause; (2) that the trial court erred in finding the parties' agreement ambiguous; (3) that the trial court's interpretation of the parties' contract violates Illinois rules of contract construction; and (4) that the trial court erred as a matter of law in failing to award attorney fees to Seller. In response, Buyer claims: (1) that the Hy-Vee Holdback is a valid and enforceable liquidated damages provision as construed by the trial court; (2) that the trial court's finding that the contract terms were ambiguous and required extrinsic evidence to interpret the parties intent was reasonable; (3) that Seller forfeited several of its arguments concerning the trial court's contract interpretation; and (4) that Seller is not entitled to attorney fees. Within Buyer's appeal (appeal No. 1-12-0432), Buyer argues that the trial court's order denying Buyer postjudgment interest must be reversed. For the following reasons, we reverse the trial court's order directing the $4.3 million be returned to the Buyer because we find that the contract provision under review is unenforceable as a penalty clause.

¶ 5                                              I. BACKGROUND

¶ 6        In 2004, Seller owned four shopping malls in eastern Iowa, which included College Square Mall (Mall) in Cedar Falls, Iowa. Wal-Mart and Hy-Vee were among the larger "anchor" stores in the Mall. The Wal-Mart occupied 160,128 square feet of space, while the Hy-Vee occupied a smaller, 59,860-square-foot building adjacent to it. Hy-Vee's original lease began in 1976 and was due to expire on December 31, 2010, subject to three, five-year renewal options. The lease provided that Hy-Vee pay a $26,166.67 monthly rent ($314,000 annum, or $5.25 per square foot) from January 1, 2006, through December 31, 2010. In addition to this base rent, Hy-Vee paid a *pro rata* share of real estate taxes and common area maintenance (CAM).

¶ 7                                         A. The Purchase Agreement

¶ 8        Prior to trial, the parties stipulated to the following in a joint statement of agreed facts.

¶ 9     In June 2004, Seller began marketing the Mall for sale and issued an offering memorandum, which opined that Hy-Vee would relocate to a larger leasehold of 75,000 square feet in Wal-Mart's former space. The Hy-Vee Expansion would increase its rented square footage by 15,000 square feet at a cost of $6 per square foot, and the former Hy-Vee space would be divided to accommodate "two new big box anchors." The memorandum contemplated that Hy-Vee would execute a new 60-month lease by March 2005. Buyer then entered into discussions with Seller to purchase the Mall.

¶ 10    In July 2004, Buyer executed a letter of intent to purchase the Mall, as well as the three other Iowa malls, for $117 million. On September 17, 2004, Buyer and Seller entered into a real estate sales contract (Purchase Agreement) to purchase the four malls, and set a closing date of December 17, 2004.

¶ 11    On October 12, 2004, Hy-Vee executed a letter of intent (Letter of Intent) to open a "first class high quality Hy-Vee retail grocery store," which is described as a "21st century prototype," in the space formerly occupied by Wal-Mart. The Letter of Intent contemplated that Hy-Vee would lease 78,337 square feet for a minimum term of 20 years, followed by five, five-year renewal options. The initial base rent would be $7 per square foot and would incrementally rise to $9.35 per square foot beyond the initial 20-year term. In addition to the base rent, Hy-Vee would pay a certain pro rata share of the Mall's real estate taxes and CAM. The parties agreed that the proposed Hy-Vee lease, which would increase the fair market value of the Mall, would not be executed prior to the closing on the sale of the Mall. Seller and Hy-Vee agreed that Hy-Vee would require 270 days to extensively remodel the new leasehold. The Letter of Intent indicated that Hy-Vee's "possession date" would occur upon: (1) execution of the lease; (2) receipt of certain government approvals; and (3) delivery of the space from Buyer.

¶ 12    On October 26, 2004, Buyer's primary negotiator, Thomas Rogers, sent a letter[1] to Seller's broker, George Good of CB Richard Ellis, that outlined certain issues of concern. One issue of concern was the economic impact of the Hy-Vee Expansion because it was not expected that Hy-Vee would sign a new lease before the December 2004 closing. To calculate the present value of the Hy-Vee Expansion, Rogers determined that the new lease would generate a future incremental income of $430,000 per year. He next calculated that, based on a 10% capitalization rate, the present value of the 20-year Hy-Vee Expansion lease was $4.3 million. To resolve the uncertainty of the new lease's impact on the $117 million sale, Rogers suggested that the $4.3 million be held back in escrow until: (1) the new lease was signed; (2) the supermarket was open for business: and (3) the leasehold was lien free.

¶ 13                            B. The Third Amendment

¶ 14    On November 10, 2004, Buyer and Seller entered into the "Third Amendment to Real Estate Sale Contract" (Third Amendment) to memorialize the parties' holdback agreement. Accordingly, the Third Amendment provided that $4.3 million of the purchase price would be

---

[1]Rogers' letter was not included in the joint statement of facts; however, it was admitted into evidence at trial.

held in escrow and released to Seller when and if: (1) Hy-Vee executes a new lease by August 31, 2005; (2) Buyer delivers and Hy-Vee accepts the new leasehold by October 31, 2005; and (3) Hy-Vee obtains, by October 31, 2005, all permits and other governmental approvals necessary to complete the expansion. Specifically, the Third Amendment provides in relevant part:

> "With respect to [the Mall], [the Buyer] and the Seller of said Property agree that at Closing they will enter into a Four Million Three Hundred Thousand and 00/100 Dollar ($4,300,000.00) holdback agreement from the purchase price of said Property ***. The holdback amount shall not be released until all of the following are satisfied: (1) execution of the lease with Hy Vee, Inc. on terms in accordance with Letter of Intent, dated October 12, 2004, attached hereto as Exhibit C, and in a form that is commercially reasonable; (2) delivery of the premises to [Hy-Vee] in the condition required *** as specified in the lease; and (3) acceptance by [Hy-Vee] of the premises and the obtaining by [them] of all permits and other governmental approvals necessary to complete the tenant's work. Should the lease not be executed by August 31, 2005, or all of the other conditions not be satisfied by October 31, 2005, the holdback amount shall not be released to the Seller, but it shall be forfeited and delivered to [the Buyer]."

¶ 15    Thomas Rogers, Buyer's primary negotiator, testified that he negotiated the $4.3 million figure with Seller's primary negotiator, Michael Fontana. Furthermore, Rogers testified that the October 31, 2005 deadline was proposed by Seller, which was corroborated by the testimony of Gerry Curciarello and Patrick O'Leary, co-managing partners of Seller. Curciarello also testified at trial that the $4.3 million figure and the October deadline were the products of an arm's-length negotiation between Buyer and Seller, and that, at the time of the negotiations, he felt that the deadline was sufficiently distant to allow Seller to meet all of its obligations.

¶ 16                    C. The Deed and Money Escrow Agreement

¶ 17    Prior to closing, on December 15, 2004, Buyer and Seller entered into a "Deed and Money Escrow Agreement" (DME), as required by the Third Amendment. The DME instructed the Escrowee to release the Hy-Vee Holdback upon the completion of the following events: (1) execution of a new commercially reasonable lease in conformity with the Letter of Intent; (2) delivery of the space to Hy-Vee; (3) acceptance of the space by Hy-Vee; and (4) Hy-Vee's receipt of all permits and other governmental approvals necessary for Hy-Vee to complete the expansion. Specifically, section VII of the DME, titled "Hy-Vee Holdback," provides as follows:

> "At any time after the Closing Date that [the Seller] shall advise [the Escrowee], in writing, and under oath, that (a) a lease in a commercially reasonable form has been signed by Hy-Vee, Inc. ('Hy-Vee') for the space previously occupied at [the Mall] by Wal-Mart ('the Hy-Vee Space') substantially in accordance with the Letter of Intent dated October 12, 2004, (b) that the Hy-Vee Space has been delivered to Hy-Vee in the condition required by the terms of such lease, (c) that the tenant [Hy-Vee] thereunder has accepted the Hy-Vee Space and (d) that such tenant has obtained all government

approvals and permits necessary for it to complete its work, then [the Escrowee] shall advise [the Buyer] in writing of such demand for payment and, unless [the Escrowee] receive objection in writing within five (5) days, the Hy-Vee Holdback shall be made to [the Seller]. If said objection is timely made, [the Escrowee is] to continue to hold the Hy-Vee Holdback subject to the joint direction of the parties or order of court."

Section VII further provides the following deadlines for these four events to occur:

"In the event that the Seller is unable to deliver such a lease signed by Hy-Vee on or before August 31, 2005, or in the event the conditions of Subscriptions (b), (c) and (d) are not satisfied on or before October 31, 2005, without default of [the Buyer], then, and only in such event, the Hy-Vee Holdback shall be paid to [the Buyer]; provided, however, if the plans have not been finalized by reason of any delay in producing, approving or revising such plans (such delay to be determined in accordance with the terms of Hy-Vee's lease), then, and in all such events, the October 31, 2005 date shall be extended by one day for each day of delay in the delivery plan approval. If [the Seller] shall notify Escrowee that it claims a delay and extension, Escrowee shall retain the Hy-Vee Holdback subject to a joint direction of the parties or an order of the court."

Curciarello testified that, at the time the DME was executed, he still believed that the October 31, 2005 deadline was sufficiently distant to allow Seller to complete all of its obligations.

¶ 18    Section VII also provides that Buyer will perform certain parking lot improvements and that Seller will later reimburse Buyer for the construction costs. If the parking lot improvements are the sole reason for Hy-Vee not fulfilling its obligations prior to the October 31, 2005 deadline, then Seller will not be determined to have failed to meet the deadline. In such event, 105% of the parking lot construction costs (determined by competitive bidding) will be paid to Buyer out of the Hy-Vee Holdback, and the remainder of the Hy-Vee Holdback will be released to Seller.

¶ 19                                   D. The New Hy-Vee Lease

¶ 20    Closing took place on December 17, 2004, and Buyer purchased the four Iowa malls for $117 million, including the Mall, which accounted for $38.5 million of the purchase price. The Mall was divided into two parcels: parcel 1, which was valued at $33.5 million and included the entire Mall property except for the Hy-Vee and former Wal-Mart leaseholds, and parcel 2, which was valued at $5 million and included only the Hy-Vee and former Wal-Mart leaseholds. Of the $5 million paid for parcel 2, $4.3 million was held in escrow pending the requirements laid out in the Third Amendment and DME.

¶ 21    After closing, Seller engaged Hy-Vee in negotiating a new lease. While the new lease was being negotiated, Seller contracted and paid for an asbestos abatement in the former Wal-Mart space, which was completed in June 2005. Hy-Vee signed the new lease (Hy-Vee Lease) on June 16, 2005. The Hy-Vee Lease provided for 79,750 square feet of the former Wal-Mart space at a price of $7 per square foot, and contemplated a minimum 20-year term, followed by five successive five-year options, which would run for a total term of 45 years. The Hy-Vee Lease provided that the original Hy-Vee store would operate while the new leasehold was

remodeled and that the 20-year term would begin to run on the date of possession, with rent becoming due on the rent commencement date.

¶ 22　　Upon receiving the Hy-Vee Lease, Buyer requested that Hy-Vee make two revisions. Although Hy-Vee refused to make the suggested revisions, Buyer signed the Hy-Vee Lease on July 15, 2005.

¶ 23　　Section 3(A) of the Hy-Vee Lease provides that Hy-Vee has 75 days following the execution of the lease, or until September 28, 2005, to submit "detailed plans and specifications for the Hy-Vee Expansion" to Buyer for approval. Buyer would then have 10 business days to approve the plans. If Buyer disapproves of the final plans, then Hy-Vee would have until 10 business days thereafter to submit revised plans, followed by an additional 7 business days for Buyer to approve them. More specifically, section 3(A)(1) provides in relevant part:

> "(1) *Plans and Approvals*. Landlord [the Buyer] and Tenant [Hy-Vee] have reviewed and approved Tenant's preliminary site plan for the Hy-Vee Expansion attached hereto as *Exhibit B* (the 'Site Plan'). On or before the 75th day following the date of this lease, Tenant at its expense shall submit to Landlord detailed plans and specifications for the Hy-Vee Expansion (the 'Final Plans and Specifications'), prepared by Tenant for Landlord's approval, which approval Landlord shall not unreasonably withhold, condition or delay. *** Landlord shall within ten (10) business days after receipt of all of said Final Plans and Specifications notify Tenant in writing of its approval or disapproval thereof, with any such disapproval to be specifically explained. If Landlord does not approve the Final Plans and Specifications as initially submitted, Tenant shall within ten (10) business days thereafter submit for approval revised Final Plans and Specifications addressing any objections. Landlord shall then have seven (7) business days after receipt of said revised Final Plans and Specifications to approve or disapprove same."

Also, section 3(A)(1) of Hy-Vee Lease (titled "Plans and Approvals") provides certain "Construction Conditions" that must be met. Subsection (a) provides for the mutual agreement between Buyer and Hy-Vee on final plans and specifications within the time frame set forth in section 3(A)(1). Subsection (d) provides that Hy-Vee must promptly submit an application for building permits, and that it shall obtain those permits and other governmental approvals within 30 days after Buyer's approval of the final plans and specifications. Subsection (d) also contains a delay provision, which provides that if Hy-Vee submits permit applications and diligently pursues obtaining them prior to the deadline, then it could, upon its written request, obtain a 60-day extension. Specifically, section 3(A)(1) of the Hy-Vee Lease provides the following construction conditions:

> "The construction of the Hy-Vee Expansion shall be further subject to the satisfaction of the following conditions (the 'Construction Conditions'):
>
> (a) The mutual agreement of Landlord and Tenant to the plans and specifications for the Hy-Vee Expansion, as provided and within the time parameters set forth in Section 3(A)(1);

(d) Tenant agrees to promptly submit an application for building permits and shall obtain all such permits and other governmental authorizations (the 'Government Approvals') required for construction of the Hy-Vee Expansion within thirty (30) days after the Landlord's approval of Tenant's Final Plans and Specifications;; [*sic*] provided, however, if Tenant timely submits such permit applications and diligently pursues obtaining such permits, upon the written request of Tenant, Tenant may obtain a sixty (60) day extension of the Construction Condition set forth in this subsection 3(A)(1)(d)."

It is undisputed that Hy-Vee did not make a written request to Buyer for an extension, and that Buyer did not notify Hy-Vee of any default under the Hy-Vee Lease.

¶ 24        Furthermore, section 3(A)(1) provides that Buyer has 120 days following the execution of the lease, or until November 13, 2005, to reach an agreement with Hy-Vee on the final plans and specifications, and if not, then Hy-Vee would have the option to abandon the expansion and remain on its original lease, while the new Hy-Vee Lease would be rendered void. Section 3(A)(1) further provides in relevant part:

"Tenant shall provide written notice to Landlord when all of the Construction Conditions have been satisfied and/or waived ***. In the event that (I) the Construction Condition set forth in subparagraph (a) is not satisfied within one hundred and twenty (120) days following the date of this Lease; *** or (iv) the Construction Condition set forth in subparagraph (d) is not satisfied within 30 days after Landlord approves the Tenant's plans and specifications (or 90 days if extended for the additional 60-day period as provided above), are not satisfied and/or waived by Tenant within (w) the 120-day period as to clause (I) set forth above, *** and (z) the 30-day period (or 90-day period, if extended the additional 60-day period) as to clause (iv) set forth above, Tenant may, as Tenant's sole and exclusive remedy, elect to terminate this lease by written notice delivered to Landlord on or before the expiration of (w) the 120-day period as to clause (I) set forth above, *** and (z) the 30-day period (or 90-day period, if extended the additional 60-day period) as to clause (iv) set forth above and, in such case, the Old Lease shall remain in full force and effect. If Tenant does not give such termination notice ***, this lease shall remain in full force and effect and the Old Lease shall be deemed to be terminated as provided in Section 52 hereof."

Hy-Vee submitted its final plans and specifications to Buyer on the September 28, 2005 deadline. Ten business days later, Buyer disapproved the plans and requested Hy-Vee to make certain revisions. On October 31, 2005, or 13 business days later, Hy-Vee submitted its revised final plans and specifications. October 31, 2005 was also the deadline set forth in the Third Amendment and the DME for Hy-Vee to obtain building permits and other government approvals, and Hy-Vee applied to the Cedar Falls building department for a construction permit and other necessary approvals on that day. Six business days later, on November 8, 2005, Buyer approved Hy-Vee's revised plans.

¶ 25     On November 2, 2005, Seller sent to Buyer a letter[2] proposing to extend the Third Amendment's October 31, 2005 deadline to January 31, 2006. In addition to the extended deadline, Seller proposed that the Hy-Vee Holdback be released to Seller, less the cost Buyer spent on the construction of Hy-Vee's new parking lot. Buyer responded on November 16, 2005 with a counter proposal that contemplated an extended deadline in exchange for Seller paying Buyer for rent that would have been paid had the original deadline been met. According to Buyer, the rent that would have been paid was approximately $47,000 per month plus a *pro rata* share of real estate taxes and CAM. Additionally, Buyer proposed that if the new deadline were not met, Buyer would receive $100,000 per month from the Hy-Vee Holdback in lieu of rent payments. The negotiations did not advance past Buyer's counteroffer, and the October 31, 2005 deadline was never extended.

¶ 26     On January 6, 2006, Buyer sent a letter to the Escrowee demanding that it release the entire $4.3 million Hy-Vee Holdback to Buyer because Seller did not meet the October 31, 2005 deadline. Three days later, Seller sent the Escrowee a letter objecting to the release of the Hy-Vee Holdback to Buyer, requesting that the Escrowee retain the Holdback subject to joint direction of the parties or the receipt of a court order. Later that day, Buyer sent another letter to the Escrowee stating that it agreed that the Escrowee should retain the Hy-Vee Holdback until the dispute was resolved. On February 9, 2006, Seller sent another letter to the Escrowee demanding that it release the Hy-Vee Holdback to Seller because all of the conditions required for release of the funds had been met, except for the completion of the parking lot improvements. Seller demanded that the $200,000 cost of the parking lot construction be deducted from the Hy-Vee Holdback, and the remaining $4.1 million be released to Seller. On February 10, 2006 and February 14, 2006, Buyer sent letters to the Escrowee objecting to the release of the Hy-Vee Holdback, and requesting that the Escrowee continue to retain the Holdback until it received a joint direction from the parties or a court order.

¶ 27     On January 27, 2006, Hy-Vee obtained a construction permit from the City of Cedar Falls. Three days later, Buyer delivered the new space, which totaled 80,189 square feet, to Hy-Vee, and Hy-Vee accepted it and all necessary permits were obtained. Under the terms of the Lease, Hy-Vee was required to complete the construction on the expansion within the next 330 days. Hy-Vee's acceptance of the premises also triggered its obligation to begin paying a *pro rata* share of the Mall's real estate taxes and CAM, in addition to its share of the existing Hy-Vee leasehold. Hy-Vee would then begin paying a minimum fixed base rent of $46,521 per month within the next 270 days, or when the new Hy-Vee supermarket opened, whichever occurred first.

¶ 28                        E. The Instant Litigation

¶ 29     On February 17, 2006, Buyer filed an action in the chancery division of the circuit court of Cook County against Seller and the Escrowee seeking declaratory judgment and specific performance, claiming that it was entitled to the $4.3 million Hy-Vee Holdback as liquidated

---

[2]Though neither Seller's proposal nor Buyer's counterproposal was included in the joint statement of facts, both were admitted into evidence at trial.

damages for Seller's failure to fulfill its contractual obligations prior to the October 31, 2005 deadline (case No. 06 CH 3427).

¶ 30    Seller also filed a suit in the chancery division on February 22, 2006 against Buyer seeking a declaratory judgment that it was entitled to the release of the entire Hy-Vee Holdback (case No. 06 CH 3586). Seller claimed that Hy-Vee's failure to obtain the necessary building permits prior to October 31, 2005 did not amount to a contractual violation because the "provided, however" clause of the Hy-Vee Lease extended the deadline to February 12, 2006. Seller also claimed that Buyer breached the DME by claiming that Seller had not fulfilled its requirements.

¶ 31    The circuit court subsequently consolidated both lawsuits.

¶ 32    Buyer also filed a separate lawsuit (case No. 06 CH 26662) against Seller seeking the recovery of $530,294.86 from the Hy-Vee Holdback for the costs that it expended on the Hy-Vee parking lot construction.

¶ 33    While the litigation was pending, on November 16, 2006, Hy-Vee opened its new supermarket in the former Wal-Mart leasehold, and has since been making payments as required under the new Hy-Vee lease.

¶ 34    Seller moved for summary judgment on December 4, 2008, arguing that the clear and unambiguous language of the Hy-Vee Lease extended the deadline for Hy-Vee to obtain government approvals from October 31, 2005 to February 2006. In response, Buyer argued that only a delay by Buyer in the delivery of plan approvals could extend the deadline. The trial court denied Seller's motion on April 9, 2009, finding that the provisions of the Third Amendment, DME, and Hy-Vee Lease, when read together, were "ambiguous as to whether the governmental approvals and authorizations [fell] within the delay provision of Section VII of the DME" because the terms "plans" and "plan approval" were not clearly defined or consistently used throughout the documents. The trial court stated that "it is not clear whether the October 31, 2005 deadline would be extended only for delays in approving the Plans and Specifications or for delays in approving the Plans and Specifications and obtaining the Government Approvals." The case then proceeded to trial for a hearing of extrinsic evidence to resolve this contractual ambiguity.

¶ 35    At trial, the circuit court heard testimony from: Garo Khalamian, president and owner of GK Development, Inc.; David Sullivan, senior vice-president of development for Buyer; Michael Fontana, Seller's senior property accountant; Gary Curciarello, co-managing partner of Seller; and Patrick O'Leary, co-managing partner of Seller along with Curciarello. It also reviewed evidentiary deposition testimony from: Thomas Rogers, Buyer's primary negotiator; and David Bailey, assistant vice president, real estate, for Hy-Vee. In addition, the trial court considered the parties' documentary evidence, such as the letters and emails exchanged between the witnesses.

¶ 36    At trial, the parties focused a great deal of time on the issue of whether the parties had intended a firm deadline of October 31, 2005 for Hy-Vee to obtain governmental approvals, or whether the date was an aspirational target for the Hy-Vee Expansion. O'Leary, Curciarello, and Fontana each testified that the October 31, 2005 deadline was a "target" or "place holder"

date that was not intended to be rigidly enforced. On cross-examination, however, Curciarello admitted that in his prior deposition testimony he testified that the purpose of an October 27, 2005 telephone conference involving himself, Garo, and Fontana was to extend the October 31 deadline. Buyer also impeached Fontana's testimony with a January 10, 2005 email sent to O'Leary and Curciarello in which Fontana wrote that "Our [the Seller's] contract with GK [the Buyer] requires us to deliver the space to Hy-Vee with plans approved and permits issued by October 31, 2005, or forfeit the money held back." Fontana wrote in an email that as long as the Hy-Vee Lease is executed by April 1, 2005, then it would be likely that the space would be delivered in time and "the seller will get the money held in escrow." Moreover, Fontana also wrote in the email that Seller was protected by a clause that provides that "delays in the Hy-Vee planning/permitting process beyond the time periods set out in the lease that are caused by GK or Hy-Vee do not count against the seller." Buyer further impeached Fontana's testimony with a March 2, 2005 email in which Fontana wrote to Curciarello that Seller would be "in jeopardy" if the Hy-Vee Lease were not executed by April 12, 2005, because "the contract with GK requires *** the space to be delivered with all delivery conditions met by October 31."

¶ 37 Following the three-week bench trial, in addition to the facts stipulated to by the parties, the trial court made additional findings of fact, which included:

> "35. Seller negotiated the terms of the New Hy Vee Lease. Buyer was permitted to suggest Lease contents and did so, but Buyer had no right to dictate lease terms. None of the lease changes suggested by buyer concerned deadlines for submissions or approval of plans or permits.

> 36. If Buyer had refused to sign a lease that Seller deemed 'commercially reasonable,' Seller would have sued Buyer for breach of contract.

> 37. The New Hy Vee Lease contained time periods triggering obligations between landlord and tenant, but did not contain a terminal date for obtaining governmental permits.

> 38. Seller never told Hy Vee that the deadlines calculated in the New Hy Vee Lease needed to be shortened to comply with the October 31, 2005 deadline.

> 39. Buyer never indicated it was concerned about the schedule set forth in the Hy Vee Lease.

> 40. At the time the parties executed the Third Amendment and DME, Seller and Buyer believed that the New Hy Vee Lease would be executed prior to August 31, 2005, and that the tenant could obtain pain approval and necessary permits by October 31, 2005. Seller believed the lease would be negotiated no later than March, 2005. As late as March, 2005, Fontana believed a lease could be executed in April followed by approval and permitted plans by October 31, 2005. As of July 15, 2005, it was still possible that the October 31, 2005 deadline could be met.

> 41. When Buyer and Seller negotiated the Third Amendment and DME, they intended October 31, 2005, to be the deadline for Hy Vee to obtain plan approval and government permits.

42. The purpose of an October 27, 2005, telephone conference involving Garo, Fontana, Curciarello, Sullivan and Rogers was in part to negotiate an extension of the October 31, 2005, deadline set forth in the contract documents. At Buyer's suggestion, Seller drafted a proposed extension of the October 31, 2005 deadline to January 31, 2006. Buyer did not accept this proposed amendment.

43. The difference between the existing Hy Vee lease and the new Hy Vee lease was approximately $430,000.00 in additional annual income to the landlord (Buyer). The Hy Vee Holdback amount of $4,300,000.00 was a term negotiated by the parties and fairly represented the incremental value of the Hy Vee Lease.

44. By the October 21, 2004, LOI, Hy Vee proposed opening a 'first class high quality Hy Vee retail grocery store', a '21st century prototype' in the 78,000 square feet space previously occupied by Wal Mart.

45. Hy Vee was one of the anchor stores at College Square Mall. Its existing space could be modified to house two new, additional anchor stores. An expanded Hy Vee was marketed as a draw for other retailers to the mall. The mall housed multiple tenants and could accommodate right 'anchor spaces.' "

¶ 38 Based on the stipulated facts and the facts laid out above, the trial court found that the parties "intended October 31, 2005, to serve as the deadline for plan and permit approval," and that Seller was in breach of contract because Hy-Vee did not obtain the necessary permits prior to October 31, 2005. The trial court further found that the Hy-Vee Holdback constituted a valid and enforceable liquidated damages clause, and it awarded the entire $4.3 million Hy-Vee Holdback to Buyer. The trial court also dismissed the related lawsuit in case No. 06 CH 26662 as moot because any damages owed to Buyer for the parking lot construction would have been paid out of the Hy-Vee Holdback.

¶ 39 Seller appeals case Nos. 06 CH 3427 and 06 CH 3586, consolidated (appeal No. 1-11-2802), claiming: (1) that the Hy-Vee Holdback is not a valid liquidated damages provision; (2) that the trial court erred in finding the parties' agreement ambiguous; (3) that the trial court's interpretation of the parties' contract violates Illinois rules of contract construction; and (4) that the trial court erred as a matter of law in failing to award attorney fees to Seller. In response, Buyer claims: (1) that the Hy-Vee Holdback is a valid and enforceable liquidated damages provision; (2) that the trial court's finding that the contract terms were ambiguous and required extrinsic evidence to interpret the parties' intent was reasonable; (3) that Seller did not forfeit several of its arguments concerning the trial court's contract interpretation; and (4) that Seller is not entitled to attorney fees.

¶ 40 The trial court later granted Seller's posttrial motion to stay the enforcement of its judgment and ordered that postjudgment interest would not apply during appeal. Buyer appealed case Nos. 06 CH 3427 and 06 CH 3586, consolidated (appeal No. 1-12-0432), claiming that the trial court deprived Buyer of its statutory right to postjudgment interest. We subsequently consolidated the separate appeals.

## II. ANALYSIS

There are two consolidated appeals before this court. First, Seller appeals the trial court's judgment in favor of Buyer, claiming: (1) that the Hy-Vee Holdback is not a valid liquidated damages provision because it amounted to an unenforceable penalty; (2) that the trial court erred in finding the parties' agreement ambiguous; (3) that the trial court's interpretation of the parties' contract violates Illinois rules of contract interpretation; and (4) that the trial court erred as a matter of law in failing to award attorney fees to Seller. In response, Buyer claims: (1) that the Hy-Vee Holdback is a valid and enforceable liquidated damages provision; (2) that the trial court's finding that the contract terms were ambiguous and required extrinsic evidence to interpret the parties' intent was reasonable; (3) that Seller forfeited several of its arguments concerning the trial court's contract construction; and (4) that Seller is not entitled to attorney fees. Second, Buyer appeals the trial court's order denying it postjudgment interest, claiming that the trial court deprived Buyer of its statutory right. For the following reasons, we reverse the trial court's finding that the liquidated damages clause was enforceable because the clause: (1) failed to satisfy the *Jameson* factors, (2) resulted in a windfall for Buyer, and (3) functions as a penalty for Seller's 91-day nonperformance.

### A. Seller's Appeal

Whether a contractual provision for damages is a valid liquidated damages provision or is an unenforceable penalty clause is a question of law that is reviewed *de novo*. *Penske Truck Leasing Co. v. Chemetco, Inc.*, 311 Ill. App. 3d 447, 454 (2000). *De novo* consideration means we perform the same analysis that a trial judge would perform. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011).

Buyer argues in its brief that the appropriate standard of review in determining the validity of the liquidated damages clause would be an abuse-of-discretion standard because the trial court made several findings of fact by concluding that the liquidated damages clause was enforceable. However, at the oral argument of the case, Buyer conceded that the appropriate standard of review in determining this issue would be *de novo*.

The central issue in Seller's appeal is whether the Hy-Vee Holdback is a valid and enforceable liquidated damages provision. Seller claims that public policy dictates that the Hy-Vee Holdback provision is an unenforceable penalty because it confers a windfall award to the nonbreaching party, and it does not specify damages for a specific breach. Buyer responds that the provision is not a penalty because Illinois courts have previously upheld liquidated damages clauses for delayed performance, even when the nonbreaching party has suffered little or no actual damages. For the following reasons, we find that the Hy-Vee Holdback is an unenforceable liquidated damages provision.

When interpreting contract provisions that specify damages, Illinois courts draw a distinction between liquidated damages, which are enforceable, and penalties, which are not. *Checkers Eight Ltd. Partnership v. Hawkins*, 241 F.3d 558, 562 (7th Cir. 2001). "The test for determining whether a liquidated-damages clause is valid as such or is void as a penalty is stated in section 356 of the Restatement (Second) of Contracts: 'Damages for breach by either party may be liquidated in the agreement but only at an amount that is reasonable in the light of

- 13 -

the anticipated or actual loss caused by the breach and the difficulties of proof of loss. A term fixing unreasonably large liquidated damages is unenforceable on grounds of public policy as a penalty.' " *Penske Truck Leasing Co.*, 311 Ill. App. 3d at 454 (quoting Restatement (Second) of Contracts § 356 (1979)). "It is a general rule of contract law that, for reasons of public policy, a liquidated damages clause that operates as a penalty for nonperformance or as a threat to secure performance will not be enforced." *Jameson Realty Group v. Kostiner*, 351 Ill. App. 3d 416, 423 (2004) (citing *Med+Plus Neck & Back Pain Center v. Noffsinger*, 311 Ill. App. 3d 853, 860 (2000), and *Grossinger Motorcorp, Inc. v. American National Bank & Trust Co.*, 240 Ill. App. 3d 737, 749 (1992)). In doubtful cases, we are inclined to construe the stipulated sum as a penalty. *Stride v. 120 West Madison Building Corp.*, 132 Ill. App. 3d 601, 605 (1985) (citing *Beuttas v. Garvey*, 270 Ill. App. 310, 318 (1933)). Furthermore, "[t]he purpose of damages is to place the nonbreaching party in a position that he or she would have been in had the contract been performed, not to provide the nonbreaching party with a windfall recovery." *Jones v. Hryn Development, Inc.*, 334 Ill. App. 3d 413, 418 (2002).

¶ 48                                            1. The *Jameson* Factors

¶ 49      In Illinois, courts will generally find a liquidated damages provision to be valid and enforceable when the three factors laid out in *Jameson* are satisfied. As stated in *Jameson*, the three elements that must be met in order to validate a liquidated damages clause are: (1) the parties intended to agree in advance to the settlement of damages that might arise from the breach; (2) the amount of liquidated damages was reasonable at the time of contracting, bearing some relation to the damages which might be sustained, and (3) actual damages would be uncertain in amount and difficult to prove. *Jameson*, 351 Ill. App. 3d at 423. Of note, all three requirements must be met in order to enforce a liquidated damages clause. Here, the Hy-Vee Holdback does not meet the first two requirements of the *Jameson* requirements. As such, the clause is not a valid and enforceable liquidated damages clause.

¶ 50                                  a. The Parties Did Not Agree in Advance
                                 That the $4.3 Million Would Be Damages for a
                                        Delay in Obtaining Permits

¶ 51      The first factor of the *Jameson* test that must be met in order to validate a liquidated damages clause is that the parties intended to agree in advance to the settlement of damages that might arise from the breach. *Jameson*, 351 Ill. App. 3d at 423. Here, there is no evidence to suggest that the parties even considered what appropriate damages would be in the event of a minor delay in obtaining permits. Rather, the evidence shows that the parties considered the damages in light of a complete failure of the Hy-Vee Lease to come to fruition and, accordingly, estimated the damages as the present-day value of the entire 20-year lease, or the equivalent of $4.3 million. Because there is no evidence that the parties contemplated damages for a minor delay in obtaining permits at the time of creating the liquidated damages clause, we cannot say that the parties agreed in advance that $4.3 million would represent the damages for any breach, including a delay of 91 days in obtaining permits.

- 14 -

¶ 52    While we realize that the trial court found that the first prong of *Jameson* had been met, we find that the trial court improperly interpreted that prong. The trial court concluded that the first prong was met because "the insertion and amount of the liquidated damages clause was intentional and negotiated through an arm's-length transaction." While we don't disagree with these facts as stated by the trial court, we find that such facts do not satisfy the first prong of *Jameson*, which requires a showing that the parties intended to agree in advance to the settlement of damages that might arise from the breach. *Jameson*, 351 Ill. App. 3d at 423. The mere negotiation and insertion of the liquidated damages clause does not show that the parties intended to agree in advance that $4.3 million would serve as liquidated damages for a 91-day delay (or any delay) in obtaining permits, while leaving the entire value of the 20-year lease still intact. Therefore, the Hy-Vee Holdback did not satisfy the first prong of the *Jameson* test and, as a result, it cannot be enforced as a valid liquidated damages provision.

¶ 53    <center>b. The Amount of Liquidated Damages Bore<br>No Relation to the Anticipated Damages<br>of a Delay in Performance</center>

¶ 54    Even though failing to satisfy the first prong would be sufficient to find the Hy-Vee Holdback unenforceable, we find that the second prong was also not satisfied here. The second *Jameson* element that must be met in order to enforce a liquidated damages clause is that the amount of the liquidated damages was reasonable at the time of contracting, bearing some relation to the damages that might be sustained. *Jameson*, 351 Ill. App. 3d at 423. Here, the parties negotiated a $4.3 million holdback, which represented the entire, present-day value of the 20-year lease, in the event that the lease did not go through. In coming to this number, the parties calculated that Buyer would lose $430,000 each year in rent if the Hy-Vee Expansion lease did not go through. Thus, while the $4.3 million in liquidated damages might have been reasonable in the event that the Hy-Vee lease never occurred, it was not reasonable for a 91-day delay in securing government permits. The holdback amount of $4.3 million simply does not bear any relation to the damages sustained for a 91-day delay in securing permits and, therefore, was not a reasonable prediction of damages. See *Dallas v. Chicago Teachers Union*, 408 Ill. App. 3d 420, 425 (2011) (parties not required to make the best estimation of damages, but must make one that is reasonable).

¶ 55    In fact, Buyer concedes in two places that $4.3 million is not an estimate of damages for a 91-day delay in obtaining permits. First, in coming to the $4.3 million figure, the parties agreed that the damages in yearly lost rent would be $430,000 per year. Thus, it cannot be said that a 91-day delay, which makes up a small fraction of a year, could reasonably result in $4.3 million of potential damages. Second, in its November 16 proposal, Buyer offered to extend the October 31, 2005 deadline in exchange for, among other things, paying the monthly rent it would lose as a result of the delay, which it estimated to be $47,000 per month plus a *pro rata* share of real estate taxes and CAM. Even if we multiply this monthly rate by three to equal the 91-day delay, the total is nowhere near $4.3 million. Again, this shows that $4.3 million had no relation whatsoever to the damages that might result from a 91-day delay in obtaining permits. As such, it is clear that the $4.3 million was not a reasonable estimate of damage for a 91-day

<center>- 15 -</center>

delay in obtaining permits and, accordingly, Buyer cannot establish the second prong of the *Jameson* test. Given that all three factors must be met in order to validate a liquidated damages clause, we find that the Hy-Vee Holdback was not a valid and enforceable liquidated damages provision.

¶ 56                     2. The Hy-Vee Holdback Amounted to a Windfall Recovery for Buyer

¶ 57    Our courts have invalidated liquidated damages clauses where they amount to a windfall for one of the parties. *Jones*, 334 Ill. App. 3d at 418. Our courts have also invalidated liquidated damages clauses based on public policy concerns where the purpose of the clause is to punish nonperformance rather than estimate damages. *Stride*, 132 Ill. App. 3d at 605. In the case at bar, the Hy-Vee Holdback must be invalidated based on public policy concerns for both of these reasons because it amounts to a windfall for Buyer and a penalty for Seller's 91-day "nonperformance" delay.

¶ 58    The Hy-Vee Holdback constitutes an unenforceable penalty clause because the provision amounted to a windfall recovery for Buyer. Here, the trial court awarded Buyer the entire $4.3 million for only a 91-day delay in approving construction permits even though the entire 20 to 45-year lease was still intact and Buyer would receive the benefits of that lease for the next 20 to 45 years. The damages awarded from the Hy-Vee Holdback, $4.3 million, are grossly disproportionate to the loss Buyer could have sustained in the event of a delay in obtaining construction permits. In essence, the trial court has allowed Buyer to receive a double recovery by not paying the $4.3 million purchase price for the Hy-Vee lease while still recovering the $4.3 million for the Hy-Vee lease over the next 20 years plus.

¶ 59    The evidence at trial shows that the purpose of the Hy-Vee Holdback was to compensate Buyer for the full value that it would have lost in the event that the Hy-Vee Expansion did not take place. Buyer's primary negotiator, Tom Rogers, testified that the Hy-Vee Holdback was a calculation of the present value of the Hy-Vee Expansion. To arrive at this figure, Rogers determined that the new Hy-Vee Lease would generate an incremental income of $430,000 per year. From there, Rogers calculated that the Hy-Vee Expansion's capitalization rate would be 10%, which is the percentage of the property's cost that would be paid by the net proceeds from the Hy-Vee Lease. To determine the present value of the Hy-Vee Expansion, Rogers then divided the annual income by the capitalization rate. The final figure, $4.3 million, represented the value of the Hy-Vee Expansion in consideration of the Hy-Vee Lease. Buyer argues that this figure was just a middle ground estimate that calculated losses over a 10-year period, and points to the trial court's finding that the parties arrived at an in-between valuation by calculating the annual income with a multiplier of 10. This, however, misunderstands the nature of a capitalization rate, which is commonly used to calculate the present value of commercial real estate. The evidence shows that the negotiations focused on using the capitalization to determine the purchase price of Hy-Vee Expansion, and not just merely multiplying the expected annual income by 10.

¶ 60    By contrast, Buyer's actual damages from the breach are significantly less. Though neither party provides an exact figure of Buyer's actual damages, the evidence at trial is instructive in arriving at a reasonable figure. Seller points to Buyer's November 16 proposal in which Buyer

- 16 -

contemplated extending the October 31, 2005 deadline in exchange for Seller paying Buyer for rent that it would have been paid had the permits been approved on time. The payments consisted of monthly payments of $47,000, plus a *pro rata* share of real estate taxes and CAM. Though Seller claims that this figure is inflated, it is far closer to the actual damages sustained in the event of a delay than the damages awarded by the Hy-Vee Holdback. Thus, Buyer was conferred a substantial windfall when it was awarded the full $4.3 million value of the Hy-Vee Holdback for a temporary delay that Buyer had attempted to settle for a significantly lesser amount.[3]

¶ 61    Buyer claims that the damages were reasonable and not an excessive windfall because the magnitude of potential damages at the time of the contract was great. Buyer argues that, had the deadline not been met, the future of the Hy-Vee Expansion could have potentially been in jeopardy. If the Hy-Vee Expansion had not been completed, the Mall could have lost significant value, and the vacancy of a major anchor store could have hurt the Mall's ability to attract future tenants, which would damage the Mall's viability. However, there is scant evidence, if any, that the Hy-Vee Expansion was in danger of complete failure. A new Hy-Vee Lease had been signed, final plans and specifications had been approved, asbestos removal had been completed, and construction had begun on parking lot improvements. The appellate record does not show that either party had a significant obstacle that would endanger the completion of the Hy-Vee Expansion. In fact, the only delay in delivery of the premises was due to the approval of construction permits, which had been applied for before the deadline expired. As such, the Hy-Vee Expansion was completed in November 2006, at which point Hy-Vee began making rent payments under its new lease. Such a scenario was not unforeseeable when the parties executed the Deed and Money Escrow in 2004. The parties thus erred in negotiating a damages provision that conferred an unreasonably large recovery for a minor delay.

¶ 62    Further, there is nothing in the evidence to suggest that if the Hy-Vee lease did not go through, that the space formerly rented by Wal-Mart could not be rented to anyone else for twenty years. Thus, Buyer's arguments about speculative and incredible potential damages do not change the fact that allowing Buyer to keep the $4.3 million and make an additional $4.3 million over the next 20 years was an unreasonable windfall.

¶ 63    *Penske Truck Leasing Co.* is instructive here. In *Penske Truck Leasing Co.*, the lessor of a vehicle lease agreement brought suit against the guarantor, and sought enforcement of the lease's liquidated damages provision. *Penske Truck Leasing Co.*, 311 Ill. App. 3d at 457-58. The liquidated damages clause in the agreement provided different methods of calculating damages for the nonbreaching lessor depending on whether it retained or sold the vehicles. *Id.* at 457. By calculating the damages before it sold the vehicles, the lessor was able to then sell the vehicles afterwards for a windfall. *Id.* Based on this, the appellate court found that the liquidated damages provision was unenforceable because the parties did not intend for the lessor to reap a windfall, and that "the award entered by the trial court [thereunder] was well in

---

[3]Further, it appears that Buyer did not suffer any "lost" rent as the 20-plus-year lease was merely pushed back 91 days. Buyer will still receive the entire profit anticipated from the 20-year lease.

excess of the actual damages suffered by [the lessor]." *Id.* The appellate court remanded the case to the trial court with instructions to calculate damages using a formula that more accurately reflected the lessor's actual losses. Id. In the instant case, the damages provision similarly provided Buyer with a windfall recovery well in excess of the actual damages suffered.

¶ 64    Buyer argues that *Penske Truck Leasing Co*. is distinguishable because the appellate court ultimately enforced the liquidated damages provision, finding that "the agreement provided for an enforceable liquidated-damages provision and not an unenforceable penalty." *Id.* at 455-56. Though the appellate court reversed in part and remanded the case back to the trial court, it did so because it found that the trial court applied the incorrect formula for determining the amount of damages to be awarded for the complained default. *Id.* at 457-58. Buyer's argument mischaracterizes the central finding in the case. *Penske Truck Leasing Co.* states:

> "In the instant case, *** paragraph 15 of the agreement provides alternative methods of computing damages. One method is applicable if plaintiff decides to sell the vehicles, while another method is used if plaintiff retains the vehicles. The trial court awarded damages based upon the method which assumed that plaintiff retained the vehicles. While Mr. Douglas testified that plaintiff initially decided to retain the vehicles because of a depressed market, the evidence is clear that plaintiff ultimately sold all four vehicles for $30,400 each. We are certain that it was never the intention of the parties to permit plaintiff to proceed under the method of recovery used when plaintiff decides to retain the vehicle but later sell the vehicles and reap a windfall in the process. If we allowed plaintiff to proceed in this manner, the damages would be so unreasonable that we should refuse to enforce the provisions of paragraph 15, and that paragraph would have to be considered a penalty provision." *Id.* at 457.

Thus, the appellate court found that the relevant provision upon which the parties calculated damages was unenforceable as a penalty because it conferred a windfall on the nonbreaching party far in excess of the actual damages that it sustained.

¶ 65    Buyer also claims that, though the amount of liquidated damages awarded to Buyer may have been greater than the amount of actual damages it sustained, Illinois courts have held that "[t]he nature of a liquidated damages provision is such that the set amount may at times exceed actual damages." *Karimi v. 401 North Wabash Venture, LLC*, 2011 IL App (1st) 102670, ¶ 27. Buyer also points to comment b in section 356 of the Restatement (Second) of Contracts, which states that a fixed amount of liquidated damages is reasonable "to the extent that it approximates the [actual] loss anticipated at the time of the making of the contract, even though it may not approximate the actual loss." Restatement (Second) of Contracts § 356 cmt. b (1979). Buyer argues that at the time the parties executed the Third Amendment in 2004, the Hy-Vee Holdback was a middle-ground estimate of what the potential damages may have been, and that the liquidated damages provision was enforceable even though the resulting damages from a breach could have been potentially higher or lower than the actual damages depending on any number of scenarios that may have unfolded.

¶ 66    Although liquidated damages may at times exceed the amount of actual damages, a damages clause providing " 'unreasonably large liquidated damages is unenforceable on

grounds of public policy as a penalty.' " *Penske Truck Leasing Co.*, 311 Ill. App. 3d at 454 (quoting Restatement (Second) of Contracts § 356 (1979)). As stated above, the damages awarded by the Hy-Vee Holdback for a delay in permit approval were unreasonably large because they far exceeded the amount of actual damages that Buyer sustained, thus resulting in a windfall to Buyer.

¶ 67                      3. The Purpose of the Hy-Vee Holdback
                    Was to Secure Performance/Punish Nonperformance

¶ 68        We also find that the Hy-Vee Holdback was intended to secure performance and to punish nonperformance. It is a general rule of contract law that, for reasons of public policy, a liquidated damages clause which operates as a penalty for nonperformance will not be enforced. *Jameson*, 351 Ill. App. 3d at 422; *Stride*, 132 Ill. App. 3d at 605 ("if the clause fixing damages is merely to secure performance of the agreement, it will be treated as a penalty and only actual damages proved can be recovered"). Given that the Hy-Vee Holdback of $4.3 million has no reasonable relation to damages caused by a 91-day delay in obtaining permits, the clause was not intended to measure damages in the event of a delay, but rather intended to be a punishment in the event of a delay.

¶ 69        In *Telenois, Inc. v. Village of Schaumburg*, 256 Ill. App. 3d 897 (1993), a cable television franchise, Telenois, entered into a franchise agreement with the Village of Schaumburg whereby Telenois would provide cable services to the Village's residents. Within the franchise agreement, there was a clause that stated: " 'This system reconfiguration will be completed by December 13, 1988. Franchisee will provide the Village with an unconditional Letter of Credit in the amount of One Hundred Thousand Dollars ($100,000) to be payable to the Village. In the event the Franchisee fails to complete this reconfiguration by December 31, 1988, the Village will collect the amount as a penalty.' " (Emphasis omitted.) *Id.* at 899. *Telenois* completed 99% of the reconfiguration by January 1989. The reason for the delay was due to the fact that Telenois could not complete the conversion without gaining access to some of the subscriber's homes. Despite the fact that the configuration was 99% complete and the reason for the delay was not within Telenois' control, the village collected the entire $100,000. The trial court ruled that the clause amounted to an unenforceable penalty clause against public policy, and on appeal, the appellate court agreed.

¶ 70        Like the contract clause in *Telenois*, the Hy-Vee Holdback clause states that Buyer would keep the $4.3 million if all the conditions were not met by a certain date, regardless of whether the conditions were never met at all or met after a slight delay. Further, like the delay that resulted in *Telenois*, which Telenois had no control over, here the 91-day delay that resulted was not within the control of Seller, as Hy-Vee was responsible for obtaining the necessary permits. While the appellate court in *Telenois* noted that the village's witness acknowledged the clause in that contract to be a "penalty," here, by conceding in the November 16 proposal that delay damages per month would be drastically less that the entire $4.3 million Hy-Vee Holdback, Buyer has impliedly conceded that the $4.3 million does not reflect damages for a 91-day delay. Thus, because both the clause at issue here and the clause that was struck down in *Telenois* operate in the same manner and have the same all-or-nothing effect, the $4.3

million Hy-Vee Holdback clause was not meant to measure damages resulting from a slight delay in performance and must not be enforced.[4]

¶ 71    Buyer argues, though, that Illinois courts have recognized the validity of a liquidated damages clause in cases where a party's performance is delayed, even when the nonbreaching party has not suffered any actual damages. In making this argument, Buyer relies on *Bethlehem Steel Corp. v. City of Chicago*, 350 F.2d 649 (7th Cir. 1965), which is the same case the trial court relied on in concluding that the liquidated damages clause here was enforceable. In *Bethlehem Steel*, Bethlehem contracted to sell steel to the City of Chicago as a part of the Dan Ryan Expressway construction project, which the city wanted to have completed by a certain date. *Bethlehem Steel*, 350 F.2d at 650-51. The contract provided that Bethlehem would deliver steel by the deadline or it would be liable for liquidated damages. *Id.* at 651. Though Bethlehem delivered the steel 52 days late, the construction was completed on schedule. Id. Bethlehem argued that the City of Chicago was not entitled to liquidated damages because it had not incurred any harm or actual damages. *Id.* The Seventh Circuit rejected Bethlehem's argument, finding that "Bethlehem now seeks to re-write the contract and to relieve itself from the stipulated delivery dates for the purposes of liquidated damages, and to substitute therefor the City's target date for the scheduled opening of [its] super highway. This [Bethlehem] cannot do." *Id.* In finding a valid liquidated damages clause, the Seventh Circuit relied on *Wise v. United States*, 249 U.S. 361 (1919), which found that courts " 'look with candor, if not with favor, upon such provisions in contracts when deliberately entered into between parties who have equality of opportunity for understanding and insisting upon their rights, as promoting prompt performance of contracts and because adjusting in advance, and amicably, matters the settlement of which through courts would often involve difficulty, uncertainty, delay and expense.' " *Bethlehem Steel*, 350 F.2d at 651 (quoting *Wise*, 249 U.S. at 366).

¶ 72    However, *Bethlehem* is distinguishable from the instant case because the liquidated damages clause there provided a specific calculation for delay as a linear function of time at a rate of $1,000 per day. *Bethlehem Steel*, 350 F.2d at 650. In doing so, the damages clause provided a reasonable amount of damages for delayed performance because each day of delay affected the other parties' ability to perform, which justified the amount of damages. *Id.* at 651.

¶ 73    In the case at bar, the Hy-Vee Holdback does not distinguish between minor delays in performance and a complete failure of the Hy-Vee Expansion, and there is certainly no per-day damage rate that was contemplated by the parties. "The element common to most liquidated damages clauses that get struck down as penalty clauses is that they specify the same damages regardless of the severity of the breach." *XCO International Inc. v. Pacific Scientific Co.*, 369 F.3d 998, 1004 (7th Cir. 2004) (citing *Checkers Eight Ltd. Partnership*, 241 F.3d at 562, *Lake River Corp. v. Carborundum Co.*, 769 F.2d 1284, 1290 (7th Cir. 1985), *M.I.G. Investments, Inc. v. Marsala*, 92 Ill. App. 3d 400 (1981), and *Kalenka v. Taylor*, 896 P.2d 222, 228-29

---

[4]Further, as noted by the Seventh Circuit, Illinois courts continue to invalidate liquidated damage clauses even where both parties are economically sophisticated. *Checkers Eight Ltd. Partnership*, 241 F.3d at 563 (citing *Telenois*, 256 Ill. App. 3d 897); *Grossinger Motorcorp, Inc.*, 240 Ill. App. 3d 737. Thus, any argument that the parties were sophisticated in the case should hold little to no weight.

(Alaska 1995)). "[T]he damages contained in a liquidated damages clause must be for a specific amount for a specific breach; the provision may not merely serve as a threat to secure performance or as a means to punish nonperformance." *Jameson*, 351 Ill. App. 3d at 424 (citing *Noffsinger*, 311 Ill. App. 3d at 860); see also *Builder's Concrete Co. of Morton v. Fred Faubel & Sons, Inc.*, 58 Ill. App. 3d 100, 107 (1978) (A liquidated damages clause "must be a specified amount for a specific breach to be paid as an alternative to performance and not as a penalty for nonperformance.").

¶ 74      It is undisputed that the Hy-Vee Holdback provided the same amount of damages regardless of the type or extent of the breach. "When a contract specifies a single sum in damages for any and all breaches even though it is apparent that all are not of the same gravity, the specification is not a reasonable effort to estimate damages; and when in addition the fixed sum greatly exceeds the actual damages likely to be inflicted by a minor breach, its character as a penalty becomes unmistakable." *Lake River Corp.*, 769 F.2d at 1290; see also *Checkers Eight Ltd. Partnership*, 241 F.3d at 562 ("If the amount of damages is invariant to the gravity of the breach, the clause is probably not a reasonable attempt to estimate actual damages and thus is likely a penalty.").

¶ 75      For the foregoing reasons, the Hy-Vee Holdback is unenforceable as it functions as a penalty where it fails to distinguish between a minor delay in permit approval and a complete failure of the construction project. As such, the Hy-Vee Holdback sought to award the entire value of the Hy-Vee Expansion for a temporary delay, which constitutes an unenforceable penalty to coerce performance rather than a valid liquidated damages provision.

¶ 76      In sum, because the Hy-Vee Holdback (1) does not meet the three requirements necessary under *Jameson* to validate a liquidated damages clause, (2) results in a windfall to Buyer, and (3) functions as a penalty for nonperformance, we find it to be invalid and unenforceable. Because Buyer is entitled to any actual damages it suffered as a result of the 91-day delay, we remand this cause to the trial court to afford Buyer an opportunity to prove its actual damages. See *Grossinger Motorcorp, Inc.*, 240 Ill. App. 3d at 752 (after liquidated damages clause is held to be unenforceable, defendant is entitled to actual damages, if any can be proven).

¶ 77      Seller also claims that the trial court erred in finding that the Deed and Money Escrow was ambiguous, and that the trial court violated several principles of contract interpretation when construing the terms of the parties' agreement. Since we find that the Hy-Vee Holdback is an unenforceable penalty, we need not address these contentions.

¶ 78                                        B. Attorney Fees

¶ 79      Seller argues that the trial court erred as a matter of law in failing to award it attorney fees under the Reaffirmation Agreement executed by Buyer prior to closing on December 14, 2004. Under the agreement, Buyer promised to "indemnify and hold harmless Sellers and each of them from and against any and all loss, cost, debt, damage (including court costs and reasonable attorney fees) for liability arising out of, directly or indirectly, the failure of any Assignee to perform the Undertakings pursuant to its assignment or arising out of its need to enforce the terms of this Reaffirmation, or both." However, the parties agree that an award of attorney fees under the Reaffirmation Agreement is contingent on the existence of a breach by

- 21 -

Buyer. We remand to the trial court to decide the issue of breach by Buyer, which could include reasonable court costs and attorney fees.

¶ 80                           C. Buyer's Appeal

¶ 81        With regard to Buyer's appeal, Buyer claims that the trial court's order denying postjudgment interest was in error because it deprived Buyer of its statutory right. However, we need not consider this issue since there is no money award.

¶ 82                           III. Conclusion

¶ 83        For the foregoing reasons, the trial court's order awarding the $4.3 million held in escrow to Buyer is reversed. Upon remand, the trial court is directed to afford buyer an opportunity to prove actual damages it suffered as a result of the 91-day delay, deduct such damages from the escrow to be awarded to Buyer, and order the release of the remaining funds to Seller. Seller's claim concerning attorney fees is also remanded to the trial court with instructions to decide the issue of breach by Buyer, including the issue of attorney fees and costs.

¶ 84        In light of the ruling that Buyer is not entitled to the $4.3 million holdback we need not consider the issue of whether Buyer is entitled to postjudgment interest.

¶ 85        Affirmed in part and reversed in part with instructions.